McLEOD, COMMISSIONER OF REVENUES, *v.* KANSAS CITY SOUTHERN RAILWAY COMPANY.

4-7150                                   175 S. W. 2d 391

Opinion delivered November 1, 1943.

*Herrn Northcutt,* for appellant.

*Joseph R. Brown,* for appellee.

GRIFFIN SMITH, Chief Justice.   Appeal by the Commissioner of Revenues is from an order permanently enjoining that official from collecting severance taxes on gravel.   Kansas City Southern's complaint admitted it was engaged in the business of a common carrier; that it owns certain lands from which gravel was severed; that severance, beginning in 1924, had continued through succeeding years, and that taxes alleged by the State to be due had not been paid.   The railroad's defense, in effect, is a denial that it is engaged in the business of mining, cutting, or otherwise severing from the soil for commercial

purposes natural resources as contemplated by Act 118, approved February 14, 1923, or any Amendatory Act.[1]

Two issues are presented. First, in taking gravel, was appellee engaged in the *business* of severing a natural resource for commercial purposes? Second, if the tax is found to be due, did a letter written March 29, 1930, by the Commissioner of Revenues, addressed to the Railroad Company's attorney, have the effect of relieving from the statutory penalty?

Act 118 of 1923 was upheld in June of the year approved. *Floyd* v. *Miller Lumber Company*, 160 Ark. 17, 254 S. W. 450, 32 A. L. R. 811. In 1925 it was again upheld, and partially construed. *Miller Lumber Company* v. *Floyd*, 169 Ark. 473, 275 S. W. 741.

In the first case numerous plaintiffs joined in a single suit to have the act declared unconstitutional. None of those seeking relief was engaged in the business of severing timber, but ". . . all [were] engaged in the business of manufacturing timber into lumber and other finished products, and the severance. of timber [was] an incidental step in the conduct of . . . manufacturing." As to some of the real property affected, the sole income was derived from the timber grown thereon, and the income could not be realized without a severance of the timber.

The decision in 1923 was a composite. In the second appeal Mr. Justice HART said that in the first case four members of the Court, for different reasons, held the statute to be a tax upon persons engaged in a particular line of business, and that it was not a property tax. He then said: "Having reached the conclusion that the tax levied by the statute was a tax on business and not on property, four members of this Court for different reasons united in a decision that the tax was an occupational tax and

[1] It is stipulated that from 1924 to date of suit 1,151,725.91 cubic yards of gravel have been removed from lands owned by the railroad and if the tax is payable, the obligation is $2,957 with 25 percent penalty. The gravel was severed from appellee's land in Sevier County, near the town of Horatio, "and used in the business of the plaintiff primarily for strengthening and balancing its tracks and roadbed in order to better serve the public in both inter- and intrastate transactions."

not a property tax." There is this further comment: "Whatever views the different members may entertain as to the soundness of our former decision, the four members of the Court who made it agree that the decision upholding the validity of the act as an occupation tax must be regarded as the law of the case."

A statement by Judge HART, appearing on pages 479-480 of the Arkansas Report, is: "The act is very broad and comprehensive, and [the tax] is levied upon all persons engaged in severing the timber from the soil for sale or commercial purposes, regardless of the purpose for which it is done."

Does the last expression, "Regardless of the purpose for which it is done," save to the State the tax contended for in the instant case?

True it is that the act is broad. But the issue before the Court in the two Floyd cases was whether those who owned timbered lands, or who owned timber but not the land, were required to pay for the privilege of severing in the circumstances there shown. A controlling distinction between the Floyd cases and the appeal now before us is that in the 1923-1925 litigation the plaintiffs below were severing for the purpose of having the logs sawed at their mills and the product sold. Stated differently, the plaintiffs were engaged in the business of selling lumber made from timber they owned, but in order to effectuate the main commercial purpose it was necessary that the tree be cut. Result of 1925 decision was to find that those seeking relief were engaged in the *business* of severing the natural resources for commercial purposes, as distinguished from cutting for private purposes.

There is force in the argument that if the General Assembly had intended to permit any exceptions, as was done in respect of forest products by § 4 of Act 118,[2] it

---

[2] Exception is that the tax shall not be required of the individual owner of timber "who occasionally severs or cuts from his own premises such stocks, logs, poles or other forest products as are utilized by him in the construction or repair of his own structures or improvements, the purpose of this clause being to exempt [from the tax] such severers as utilize forest products to their own personal use and not for sale, commercial gain, or profit."

would have expressed such intent. Gravel is not excluded. If it should be conceded the purpose was to set up a particular class and say that as to it the tax was not assessable, the fact remains that before the tax was chargeable against any *producer,* the one obligated must have been *engaged in the business of severing natural resources.* Section 3 of Act 283 provides that "Every person . . . severing natural resources *under the provisions of this section* shall be liable to the State 'for the severance tax imposed herein. . . .'" Section 3 amends § 4 of Act 118. We do not think it was the legislative intent, by use of the language here italicized, to change the general effect of Act 118 except administratively. Under Act 118, § 4, the producer, at the time of rendering a quarterly report, remitted to the Treasurer of State. The amendment in Act 283 required payment to the Treasurer "through the Commissioner of Revenues." It also substituted a monthly for a quarterly period.[3]

Specifically, Judge HART's opinion in *Miller* v. *Floyd* is that the levy was not against property, but was an occupation tax. The word "privilege," as used in the Constitution, meant, said Judge HART, that the General Assembly should have power from time to time to tax occupations for revenue "which are privileges within the meaning of the proviso." The Judge then said that § 1 of Act 118 provided, in effect, for the levying of a privilege or license tax upon each person, firm, or corporation, called the producer, "engaged in the business . . . of severing from the soil or water for commercial purposes natural resources."

In upholding Act 118, necessary effect of the 1925 decision was to say that severing natural resources for commercial purposes was a privilege, not a common right. It is removal of the activity from the realm of common right, and determination that it is a privilege, which renders the tax constitutional, for in *Sims* v. *Ahrens,* 167

---

[3] Act 118 required those engaged in the business of severing natural resources to procure a license from the State Tax Commission, "or any commission hereafter created by law." The complaint in *Miller* v. *Floyd* alleged that at that time there was no State Tax Commission, it having been abolished in 1923 and duties conferred upon the Railroad Commission.

Ark. 557, 271 S. W. 720,[4] it was said that ". . . this Court cannot consistently hold that it is within the power of the Legislature to declare and tax as privileges, for State revenue, pursuits and occupations which are matters of common right."[5]

It is insisted in the case at bar that the Railway Company, in using gravel to ballast and otherwise maintain its tracks, converted such natural resource into transportation, just as timber taken from its lands might be made into paper from which tickets could be printed.

We are confronted with two rules of construction: one that an Act of the Legislature will be held constitutional and in other respects valid if by any reasonable theory this can be done; the other that property cannot be taxed unless the intent clearly appears. Because Act 118 and all amendments materially affecting it appear to contemplate only a tax on those engaged in the business of severing natural resources for commercial purposes, and appellee is not engaged in such business, we must hold that the Chancellor correctly restrained the Commissioner of Revenues from collecting the tax. In this view of the matter it becomes unnecessary to discuss the second question raised by appellant.

Affirmed.

---

[4] The Sims-Ahrens decision was handed down January 19, 1925, preceding the *Miller Lumber Company* v. *Floyd* case October 5 of the same year.

[5] In the instant case the Railway Company is a corporation, and falls within the class which may have its franchise taxed, as was the case with plaintiffs below in the *Floyd* v. *Miller Lumber Company* controversy; hence, taxation of an individual's occupation for State purposes is not involved.

McFADDIN, J., (dissenting). In this case, the appellee railway company owned land in fee, and employed Peck & Son to sever the gravel from the land. The railway company then used the gravel to ballast its tracks anywhere that ballast might be needed, but entirely away from the land from which the gravel was severed. Is the railway company liable to the State of Arkansas for the severance tax on the gravel so severed? That is the question.

The original severance tax act was No. 118 of 1923. There have been several amendments, a few of which are Act No. 283 of 1929, Act No. 116 of 1933, and Act No. 138 of 1933. These acts, as compiled, are found in §§ 13371 ff. of Pope's Digest. By § 13371, the tax was levied on any person, firm or corporation "engaged in the business of mining, cutting or otherwise severing from the soil or water for commercial purposes natural resources, including . . . gravel." The majority holds that the railway company is not liable for severance tax in this case. I dissent for the two reasons which I now discuss:

*First:* The railway company was engaged in the *business* of severing for *commercial purposes* within the purview of the act. What is the *business* of severing? Business, as defined by Webster's Dictionary, means more than mercantile transactions. Business means: "quality or state of being busy; . . . that which one has to do or should do; . . . that which engages time, attention or labor." See, also, 9 C. J. 1102. Mr. Justice BATTLE, in *Hickey* v. *Thompson,* 52 Ark. 234, 12 S. W. 475, said: "The primary signification of the word 'business' is employment—'that which employs time, attention and labor.'" So, with "business" defined by this court in 1889, the Legislature could well use the word in 1923 expecting this court to give the word its primary and judicially defined meaning. "Thus words which have been defined by statute or which have previously been given a well-defined meaning by the courts, are presumed to have that same meaning in the statute." 59 C. J. 1012. So the words, "engaged in the business of severing," as used in the statute—when read in the light of this court's definition of "business," as aforesaid—

mean "engaged in the time, attention or labor of severing." Certianly the railway was so engaged even in severing gravel from its own land, for the severing required time, attention and labor.

What is meant by "commercial purposes"? Webster's Dictionary defines "commercial" as "of or pertaining to commerce"; and "commerce" is defined as "business intercourse; . . . the exchange of merchandise on a large scale between different parties or communities." It seems elementary that a railroad is engaged in commerce when it sells its service to the public. The gravel severed from the land was used to make the road bed so that trains could carry commerce. Certainly the gravel was therefore used for commercial purposes.

So, by simple definitions, I believe the statute means that the *time, attention and labor of severing for use in commerce* was the taxable act concerning the gravel of the railway company, and this taxable act occurred even though the railway company never sold the gravel to a third person, but used it on its own property.

The majority hold that because the railway company did not re-sell the gravel there was no severance within the meaning of the Act. Such a construction makes the ultimate disposition of the gravel the test as to whether the State's natural resources have been depleted. The purpose of the Act was to prevent the natural resources from being severed without a tax being paid therefor. The severance is just as complete—the natural resources are just as despoiled—if the gravel be used by the severer, as if the gravel be sold to and used by a third party. Under the holding of the majority, a large corporation is greatly favored over a small individual. An individual would take the gravel to some construction company for re-sale, and would thus be liable for the severance tax. But a large railroad company—by owning its own gravel pits and owning its own stone quarries and owning its own forests—could despoil the State of its natural resources in gravel, stone and timber for the purpose of building railroads, depots and other facilities,

and still would never be liable for the severance tax. I cannot believe that the Legislature ever intended to pass such an Act as the majority has construed this to be.

*Second: The Exemption.* The second reason for my dissent is because I believe the majority has failed to give any effect to the exemption clause contained in § 13374 of Pope's Digest. This clause reads: "Provided, this Act shall not apply to nor shall any severance tax be required of the individual owner of timber who occasionally severs or cuts from his own premises such stocks, logs, poles or other forest products as are utilized by him in the construction or repair of his own structures or improvements, the purpose of this clause being to exempt therefrom such severers as utilize forest products to their own personal use and not for sale, commercial gain or profit."

It is a cardinal rule of construction of statutes that effect must be given, if possible, to the whole statute and every part thereof. 59 C. J. 995. An interpretation which gives effect to the entire statute should be selected, as against one which does not. *Summers* v. *Cole,* 144 Ark. 494, 223 S. W. 721; West's Arkansas Digest "Statutes," § 206.

The majority's construction renders the exemption clause above quoted to be entirely useless, a mere waste of words, because under the majority's construction, everyone is exempt from severance tax as long as such severer does not *sell* the severed resources. If the Legislature meant what the majority has held, then why did the Legislature place in the Act an exemption clause in favor of "an individual owner of timber who occasionally severs or cuts from his own premises . . . forest products as are utilized by him in the construction or repair of his own structures; the purpose of this clause being to exempt therefrom such severers as utilize forest products for their own personal use . . ."?

It seems clear to me that the Legislature, in exempting only severers using timber on their own lands, intended to tax all severers of any other resource except timber, even though such other resource was used on the

severer's own property. The exemption clause in § 13374 shows what the Legislature intended to exempt, and the holding of the majority rides roughshod over this exemption clause and renders it entirely nugatory.

Therefore, for the reasons stated, I respectfully dissent.